DANIEL O. BLAU (Cal. Bar No. 305008)
Email: blaud@sec.gov
M. LANCE JASPER (Cal. Bar No. 244516)
Email: jasperml@sec.gov

Michele Wein Layne, Regional Director
Alka Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3306
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>FUSION HOTEL MANAGEMENT LLC, FUSION HOSPITALITY CORPORATION, AND DENNY T. BHAKTA,<br><br>Defendants. | Case No. '21CV2085 L    MSB<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## SUMMARY

1.     This is an enforcement action brought against defendant Denny T. Bhakta ("Bhakta"), and two entities he founded and controlled, defendants Fusion Hotel Management, LLC ("FHM") and Fusion Hospitality Corporation ("FHC") (together, "Fusion," and collectively with Bhakta, "Defendants"), for a fraudulent offering and sale of securities that was nothing more than a Ponzi scheme.

1

2.      From at least January 2016 until at least February 2020, Bhakta, through Fusion, raised over $15 million from more than 40 investors. Bhakta told investors they were investing in Fusion's business of acquiring blocks of hotel room reservations from major hotel chains at wholesale rates and selling those rooms at a profit to Fusion's corporate clients. Bhakta claimed that Fusion had a successful track record of buying and selling hotel rooms for profit; that Fusion could leverage its relationships with large hotel chains and airlines to generate profits for Fusion and its investors; and that investments made with Fusion were secured by surety bonds and insurance. In several cases, Bhakta sent investors supposed contracts with hotel room suppliers and customers concerning the purchase and sale of room blocks, and provided investors with purported bank statements that appeared to reflect legitimate business activity.

3.      In reality, Fusion's purported business was a sham. Fusion did not buy and sell blocks of hotel rooms for profit and had no insurance or surety bonds to secure investments with Fusion. It did not have the claimed agreements with corporate clients and did not acquire hotel room blocks or pre-sell rooms as represented to investors. The contracts and bank statements Bhakta sent to investors were fabricated, and Bhakta used substantial amounts of investor funds for Ponzi payments and personal expenses, including millions of dollars gambled and lost at casinos. Eventually, Bhakta's Ponzi scheme failed, leaving investors with substantial losses.

4.      Through this conduct, Bhakta and Fusion violated Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.

**JURISDICTION AND VENUE**

5.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27(a) of the Exchange Act,

1 | 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa(a).

2 | 6. Defendants have, directly or indirectly, made use of the means or
3 | instrumentalities of interstate commerce, of the mails, or of the facilities of a
4 | national securities exchange in connection with the transactions, acts, practices,
5 | and courses of business alleged in this complaint.

6 | 7. Venue is proper in this district pursuant to Section 22(a) of the
7 | Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15
8 | U.S.C. § 78aa(a), because certain of the transactions, acts, practices, and courses of
9 | conduct constituting violations of the federal securities laws occurred within this
10 | district. In addition, venue is proper in this district because defendant Bhakta
11 | resides in this district and defendants FHM and FHC have their principal places of
12 | business in this district.

13 | **THE DEFENDANTS**

14 | 8. **Fusion Hotel Management, LLC ("FHM")** is a California limited
15 | liability company formed by Bhakta in October 2011. Its principal place of
16 | business is San Diego, California. FHM and its securities offerings are not and
17 | have never been registered with the SEC.

18 | 9. **Fusion Hospitality Corporation ("FHC")** is a California corporation
19 | registered by Bhakta in November 2017. Its principal place of business is San
20 | Diego, California. FHC and its securities offerings are not and have never been
21 | registered with the SEC.

22 | 10. **Denny T. Bhakta ("Bhakta")**, age 39, is a resident of San Diego,
23 | California. He controlled FHM, FHC, and their bank accounts at all relevant
24 | times. He owned both FHM and FHC except for relatively small, minority interests
25 | he sold to investors in FHC. Bhakta never registered with the SEC or associated
26 | with a registered entity. Bhakta was an employee of an international hotel chain in
27 | the San Diego area from approximately 2008 to 2010.

28 |

3

1                               **FACTUAL ALLEGATIONS**

2    **A.      The Fusion entities**

3           11.    Bhakta formed FHM in San Diego, California, in 2011.

4           12.    At all times, Bhakta was the sole managing member of FHM.

5           13.    At all times, Bhakta was solely responsible for FHM's day-to-day

6    activities.

7           14.    At all times, Bhakta had exclusive control of FHM's bank accounts.

8           15.    Bhakta formed FHC in San Diego, California, in 2017.

9           16.    At all times, Bhakta was the sole executive officer of FHC.

10          17.    At all times, Bhakta was the only manager of FHC.

11          18.    At all times, Bhakta was solely responsible for FHC's day-to-day

12   activities.

13          19.    At all times, Bhakta had exclusive control of FHC's bank accounts.

14   **B.      Fusion's offer and sale of securities**

15                  **1.      The capital notes**

16          20.    Defendants raised investor funds pursuant to "Capital Notes" that

17   were issued by FHM and/or FHC.

18          21.    Fusion raised at least $12.5 million from at least 40 investors through

19   the sale of Capital Notes.

20          22.    The Capital Notes promised high returns to be realized from profits

21   generated by Fusion's purported business of buying and selling room reservations.

22          23.    Principal amounts for the notes ranged from approximately $35,000 to

23   $750,000. Each note provided for a specific return, either in the form of a flat

24   amount or an interest rate, and typically equated to between 15% and 44% per

25   year.

26          24.    The Capital Notes constitute investment contracts.

27          25.    Purchasers of the Capital Notes invested money in exchange for the

28   notes.

26.     As Bhakta described the deals to investors, both the investors' and Fusion's profits came out of the profit made by Fusion's successful sale of hotel rooms for more than the amount paid for those rooms.

27.     Fusion represented to prospective investors that their funds were to be pooled together to be used to acquire hotel rooms.

28.     Bhakta pooled investor funds and used some of those funds to make Ponzi payments.

29.     Fusion's investors expected the profits from their investments to be derived solely from Fusion's efforts to acquire and sell blocks of hotel rooms.

30.     The Capital Notes also constitute notes subject to the federal securities laws.

31.     Purchasers bought the Capital Notes for investment purposes and not for commercial or consumer purposes.

32.     The Capital Notes were sold to a broad segment of the public, including more than 40 investors located in multiple states.

**2.     The stock certificates**

33.     In several instances, Defendants raised investor funds through the sale of "Stock Certificates" issued by FHC.

34.     Investors received the Stock Certificates in return for capital contributions.

35.     Both Fusion and investors described the Stock Certificates as representing "shares of common stock" in FHC.

36.     Fusion raised at least $2,500,000 from at least 3 investors through the sale of Stock Certificates.

**C.     Bhakta's false representations**

37.     Bhakta raised money from investors by lying to them about the business activity of Fusion.

38.     Bhakta represented that Fusion would use investor funds to buy hotel

1  rooms from a major hotel chain ("Hotel Supplier") and sell them at a profit to a

2  major airline ("Airline Customer").

3     39.    Bhakta told investors he had experience and relationships in the hotel

4  industry that he could use to acquire and sell blocks of hotel rooms for profit, and

5  that Fusion had a successful track record of buying and selling hotel room nights

6  for profit, including millions of dollars made in connection with rooms sold to

7  Airline Customer and for large conventions.

8     40.    Fusion did not have the represented track record of buying and selling

9  hotel room nights for a profit.

10    41.    Bhakta did not have the represented business relationships with major

11 hotels or airlines.

12    42.    Bhakta made a series of materially false representations to investors to

13 induce their investment in Fusion.

14          **1.    The June 2017 solicitation**

15    43.    For example, in June 2017, Bhakta told one prospective investor, over

16 the phone, that Fusion needed $120,000 to close a deal by which Fusion would

17 obtain and then pre-sell a year's worth of bookings for 84 hotel rooms, or

18 approximately 30,000 room-nights, to Airline Customer. Bhakta told this investor

19 that Fusion would sell the room-nights at a profit margin of $40 each

20 (approximately $1.2 million in aggregate profit). Bhakta told the investor that, in

21 exchange for the investment of $120,000, the investor would receive payments

22 totaling $132,000 within one year.

23    44.    Bhakta's representations to the investor were false and misleading.

24 Fusion had no deal to purchase rooms from Hotel Supplier or to sell them to

25 Airline Customer.

26          **2.    The 2017 FHM solicitation brochure**

27    45.    As another example, in 2017, Bhakta provided a prospective investor,

28 by means of the internet, with an FHM document describing FHM as profitable

1   and having $4.2 million in revenue and stating that "FHM secures the rooms at

2   wholesale rates, compensates the hotels upfront, and packages these rooms for

3   convention clients at retail rates."

4       46.    In that same document, Bhakta included what he represented to be an

5   internal analysis by Hotel Supplier that showed that Hotel Supplier had analyzed

6   the specific deal with Fusion and found that it would be profitable for Hotel

7   Supplier.

8       47.    In that same document, Bhakta also included what he claimed was a

9   contract for the purchase of a large block of hotel rooms by Airline Customer.

10      48.    Bhakta represented that the contract was executed by Airline

11  Customer.

12      49.    None of these representations were true. FHM did not have the

13  represented revenue. FHM had no business of buying and selling large hotel room

14  blocks for profit.

15      50.    There was no analysis by Hotel Supplier of a prior or existing deal

16  with Fusion, as there was no prior or existing deal between Hotel Supplier and

17  Fusion.

18      51.    In reality, there was no contract with Airline Customer.

19      52.    In or about September or October of 2017, Bhakta had an in-person

20  meeting with investors where he showed them, on his laptop screen, what he

21  purported to be the contract with Airline Customer, this time with signatures and

22  without redactions.

23      53.    This document was not what he represented it to be. In reality, there

24  was no contract with Airline Customer.

25      **3.    Subsequent telephonic solicitations for additional**

26          **investment**

27      54.    Within a week of the solicitation made in or about June 2017, Bhakta

28  solicited investors, by telephone, for further investment.

7

1    55.    He told one investor that Airline Customer, having purchased the

2   block of rooms secured with the June 2017 investment, saw the benefit of that

3   transaction and wanted to undertake a similar transaction in a new market.

4    56.    Bhakta claimed he needed additional funds to purchase a block of

5   hotel rooms in Dallas for sale to Airline Customer.

6    57.    In reality, there was no additional deal with Airline Customer.

7    **4.    Renewal agreement**

8    58.    In or about August 2017, Bhakta sent an investor, by means of the

9   internet, a purported executed renewal contract between FHM and Airline

10   Customer for 45 additional days of hotel rooms representing over $800,000 in

11   additional revenue for FHM.

12    59.    In reality, FHM had no contracts with Airline Customer and had

13   received no revenue from Airline Customer.

14    **5.    September 2017 contracts**

15    60.    In or about September 2017, using an online document sharing

16   service, Bhakta provided investors with copies of purported contracts between

17   Fusion and Airline Customer and Fusion and Hotel Supplier. These contracts were

18   purportedly for millions of dollars in hotel rooms.

19    61.    In a telephone call with investors that same day, Bhakta represented

20   that these contracts had been executed and were in force.

21    62.    In reality, this was not a real contract. Fusion did not have the

22   represented contracts with any hotels or corporate customers.

23    **6.    Early 2018 solicitation brochure**

24    63.    As another example, in early 2018, Bhakta sent investors a solicitation

25   brochure by means of the internet.

26    64.    This solicitation contained many of the same misrepresentations

27   Bhakta had made previously regarding Fusion's record of profitable business.

28    65.    This solicitation also contained a purported financial statement

1  showing Fusion's financial performance since 2011. According to this financial

2  statement, Fusion had generated millions of dollars in revenue since 2011.

3      66.    In reality, Fusion had generated no or virtually no revenue from

4  operations.

5                    **7.    Revenue spreadsheet**

6      67.    Towards the end of 2018, Bhakta sent one investor a spreadsheet titled

7  "market segmentation." The spreadsheet purported to show how many rooms

8  Fusion had sold in 2018, and stated that Fusion had made over $130,000,000 in

9  revenue in 2018.

10     68.    In reality, Fusion earned no or virtually no revenue in 2018.

11                   **8.    Food & beverage revenue spreadsheet**

12     69.    In late 2018 or early 2019, Bhakta sent one investor a spreadsheet

13  titled "F&B Revenue Summary."

14     70.    Bhakta represented to the investor that this spreadsheet showed the

15  positive revenue impact that Fusion's hotel room brokering had on Hotel Supplier.

16  Bhakta represented that, by selling rooms to large companies like Airline Customer

17  that provided a food and beverage credit to their employees, the hotels received

18  additional revenue beyond hotel room revenue. Bhakta explained that this food and

19  beverage revenue was a reason that Hotel Supplier agreed to sell Fusion large

20  blocks of hotel rooms at below market prices.

21     71.    Contrary to Bhakta's representations, the "F&B Revenue Summary"

22  did not represent Fusion's actual impact on hotel revenue. Fusion bought and sold

23  no or virtually no hotel rooms, and had no or virtually no impact on any hotel's

24  business.

25                   **9.    Bond**

26     72.    Bhakta created "Capital Note" agreements that were executed by

27  himself and investors pursuant to the loans made by investors to Fusion.

28     73.    These Capital Note agreements included a "guaranty" clause that

1 stated that the investments in Fusion were insured and bonded.

2   74. Bhakta also further represented to investors that, if the room block

3 purchased by Fusion failed to sell, Fusion's bond would repay them their

4 investment.

5   75. This was untrue. Fusion had no such insurance or bond.

6 **D. Defendants' misrepresentations were knowing and material**

7   76. The investors to whom Bhakta provided the above false information

8 subsequently invested in Fusion.

9   77. Defendants' representations concerning Fusion's purported business

10 activities and prospects, and the security of investors' funds, were important to

11 Fusion's investors.

12   78. It was important to investors that Fusion had a track record of selling

13 hotel rooms for profit and had relationships with Hotel Supplier and Airline

14 Customer.

15   79. Fusion's supposed successful track record lent credibility to Bhakta's

16 claim that Fusion could profitably serve as a middle-man between hotels with a

17 large inventory of rooms and clients with a high demand for rooms on a regular

18 basis.

19   80. It would have been important to investors to know that Fusion's

20 payments to them were made from other investors' monies, and not from Fusion's

21 revenues or business activity, as well as that Bhakta was using Fusion investors'

22 money to pay his personal expenses.

23   81. Bhakta knew or was reckless in not knowing that his representations

24 regarding his and Fusion's successful track record brokering hotel rooms, and their

25 use of investors' funds, were false.

26   82. As the principal of Fusion, the sole signatory on Fusion's bank

27 accounts, and the person with the purported relationships with Hotel Supplier and

28 Airline Customer, Bhakta knew or was reckless in not knowing that: (1) he and

Fusion did not have the claimed relationships with those companies; (2) he and Fusion never sold hotel rooms to Airline Customer; (3) he was routinely misappropriating investor funds instead of using them to buy and sell hotel rooms for profit; (4) his repayment of the Capital Notes came from investor funds, rather than profitable transactions; (5) he never obtained insurance or surety bonds to secure the Capital Notes; and (6) the contracts and bank statements purporting to evidence Fusion's business dealings with Hotel Supplier and Airline Customer were not real.

83.    In the alternative, Defendants did not exercise reasonable care in their representations to investors concerning Fusion's business activities and prospects and the security of investors' funds.

84.    Bhakta's scienter and failure to exercise reasonable care are imputed to Fusion because he was Fusion's sole controlling principal.

85.    Bhakta was the maker of his oral and written representations to prospective Fusion investors, and he made these representations on behalf of Fusion.

**E.    Bhakta's misuse of investor funds**

86.    In or about June or July 2017, Bhakta was asked by three prospective investors to demonstrate that Fusion used investor funds as promised.

87.    In or about June or July 2017, Bhakta sent the prospective investors bank statements for Fusion that appeared to reflect the use of investor funds for large payments to Hotel Supplier and the subsequent receipt of large payments from Airline Customer.

88.    These bank statements were fictitious.

89.    Fusion's actual bank statements reflect no substantial legitimate business activities.

90.    Fusion's actual bank statements show substantial payments for Bhakta's personal use. For example, in or about May 2017, Bhakta used $11,000 in

Fusion funds to pay off his credit card. In or about October 2017, he spent $7,800 in Fusion funds at a department store and $30,000 paying off his credit card.

91.    Bhakta also spent substantial sums of Fusion funds gambling at casinos. For example, in or about May 2017, Bhakta spent $80,000 in Fusion funds at a casino. On or about July 6, 2018, Bhakta wired $600,000 from an FHM account to a casino. On or about July 26-27, 2018, Bhakta withdrew cashier's checks from an FHM account in the amounts of $30K, $70K, $100K and $100K, which were deposited with a casino for chips.

92.    Fusion did not earn revenues in an amount sufficient to cover the personal expenses Bhakta paid from Fusion's accounts.

93.    Fusion made at least $1,300,000 in payments to investors on the Capital Notes.

94.    Because Fusion had little or no business activity, these payments to investors were Ponzi payments made using incoming investor funds.

95.    For example, on or about January 31, 2017, Fusion used investor funds to pay $100,000 to an investor.  On or about February 1, 2017, Fusion used investor funds to pay a total of $106,000 to three investors.  On or about June 19, Fusion used investor funds to pay a total of $261,000 to two earlier investors. Between August 28, 2017 and September 6, 2017, Fusion used investor funds to pay a total of more than $800,000 to six earlier investors.

96.    In 2019, Fusion began failing to make payments to certain of its larger investors.

### FIRST CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10b of the Exchange Act**

**And Rule 10b-5 Thereunder**

**(Against All Defendants)**

97.    The SEC realleges and incorporates by reference paragraphs 1

12

1  through 96 above.

2      98.    Defendants Bhakta, FHM, and FHC engaged in a fraudulent scheme

3  in which they raised over $15 million through the sale of securities by, among

4  other things, (i) falsely representing to investors that FHM and FHC had a

5  longstanding, profitable, and ongoing business of buying and selling hotel room

6  blocks, (ii) falsely representing that investor funds would be used to purchase hotel

7  rooms blocks, which would be resold at a profit, and (iii) misleading investors as to

8  the source of payments to investors in order to make it appear that Fusion was

9  operating and generating returns. Defendants knew or were reckless in not

10  knowing that they were misrepresenting the existence of the business, the financial

11  history of the business, the sources of funds paid to investors, and the allocation of

12  investor funds.

13      99.    By engaging in the conduct described above, Defendants, and each of

14  them, directly or indirectly, in connection with the purchase or sale of a security,

15  and by the use of means or instrumentalities of interstate commerce, of the mails,

16  or of the facilities of a national securities exchange, acting with scienter:  (a)

17  employed devices, schemes, or artifices to defraud; (b) made untrue statements of a

18  material fact or omitted to state a material fact necessary in order to make the

19  statements made, in the light of the circumstances under which they were made,

20  not misleading; or (c) engaged in acts, practices, or courses of business which

21  operated or would operate as a fraud or deceit upon other persons.

22      100.   By engaging in the conduct described above, Defendants each

23  violated, and unless restrained and enjoined will continue to violate, Section 10(b)

24  of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §

25  240.10b-5.

26

27

28

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (Against All Defendants)

101.   The SEC realleges and incorporates by reference paragraphs 1 through 96 above.

102.   Defendants Bhakta, FHM, and FHC engaged in a fraudulent scheme in which they raised over $15 million through the sale of securities by, among other things, (i) falsely representing to investors that FHM and FHC had a longstanding, profitable, and ongoing business of buying and selling hotel room blocks, (ii) falsely representing that investor funds would be used to purchase hotel rooms blocks, which would be resold at a profit, and (iii) misleading investors as to the source of payments to investors in order to make it appear that Fusion was operating and generating returns. Defendants obtained money by means of their material misrepresentations, in the form of over $15 million raised from investors.

103.   By engaging in the conduct described above, Defendants, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) with scienter, employed devices, schemes, or artifices to defraud; (b) with scienter or negligence, made untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) with scienter or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

104.   By engaging in the conduct described above, Defendants each violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(1), (2),

1 | and (3).

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that the defendants committed the alleged violations.

### **II.**

Issue orders, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, temporarily, preliminarily, and permanently enjoining defendants Bhakta, FHM, and FHC and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### **III.**

Order defendants to disgorge, jointly and severally, all funds received from their illegal conduct, together with prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

### **IV.**

Order defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### **V.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable

15

1   application or motion for additional relief within the jurisdiction of this Court.

2   **VI.**

3         Grant such other and further relief as this Court may determine to be just and

4   necessary.

5

6

7   Dated:  December 14, 2021                   Respectfully submitted,

8

9                                       */s/ Daniel O. Blau*

10                                   Daniel O. Blau

                                      M. Lance Jasper

11                                   Attorneys for Plaintiff

                                      Securities and Exchange Commission

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28